Ronald CHISOM, et al.,

v.

Edwin EDWARDS, et al.

Civ. A. No. 86–4075.

United States District Court,
E.D. Louisiana.

May 1, 1987.

As Amended July 10, 1987.

William P. Quigley, Ron Wilson, Roy Rodney, New Orleans, La., C. Lani Guinier, Pamela S. Karlan, New York City, for plaintiffs.

William J. Guste, Jr., Atty. Gen., Eavelyn T. Brooks, Asst. Atty. Gen., Louisiana Dept. of Justice, M. Truman Woodward, Jr., Black G. Arata, A.R. Christovich, Moise W. Dennery, New Orleans, La., for defendants.

## OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This matter is before the Court on defendants' motion to dismiss for failure to state a claim upon which relief can be granted pursuant to F.R.Civ.P. 12(b)(6). For the foregoing reasons, defendants' motion is GRANTED.

### FACTS AND ALLEGATIONS

Ronald Chisom, four other black plaintiffs and the Louisiana Voter Registration Education Crusade filed this class action suit on behalf of all blacks registered to vote in Orleans Parish. Plaintiffs' complaint challenges the process of electing Louisiana Supreme Court Justices from the First District of the State Supreme Court. The complaint alleges that the system of electing two at-large Supreme Court Justices from the Parishes of Orleans, St. Bernard, Plaquemines and Jefferson violates the 1965 Voting Rights Act, as amended, 42 U.S.C. § 1973 et seq., the fourteenth and fifteenth amendments to the United States Federal Constitution and, finally, 42 U.S.C. § 1983. Plaintiffs argue that the election system impermissibly dilutes, minimizes and cancels the voting strength of blacks who are registered to vote in Orleans Parish.

More specifically, plaintiffs' original and amended complaint avers that the First Supreme Court District of Louisiana contains approximately 1,102,253 residents of which

63.36%, or 698,418 are white, and 379,101, or 34.4% are black. The First Supreme Court District has 515,103 registered voters, of which 68% are white, and 31.61% are black. Plaintiffs contend that the First Supreme Court District of Louisiana should be divided into two single districts. Plaintiffs suggest that because Orleans Parish's present population is 555,515 persons, roughly half the present First Supreme Court District, the most logical division is to have Orleans Parish elect one Supreme Court Justice and the Parishes of Jefferson, St. Bernard and Plaquemine together elect the other Supreme Court Justice. If plaintiffs' plan were to be carried out, plaintiffs contend the present First Supreme Court District encompassing only Orleans Parish would then have a black population and voter registration comprising a majority of the district's population. More specifically, plaintiffs assert presently 124,881 of the registered voters in Orleans are white, comprising 47.9% of the plaintiffs' proposed district's voters; while 134,492 of the registered voters in Orleans are now black, comprising 51.6% of the envisioned district's voters. The other district comprised of Jefferson, Plaquemines and St. Bernard Parishes and would have a substantially greater white population than black, according to plaintiffs' plan.

Plaintiffs seek class certification of approximately 135,000 black residents of Orleans Parish, whom plaintiffs allege suffer from diluted voting strength as a result of the present at-large election system. Additionally, plaintiffs seek a preliminary and permanent injunction against the defendants restraining the further election of Justices for the First Supreme Court District until this Court makes a determination on the merits of plaintiffs' challenge. Further, plaintiffs seek an order requiring defendants to reapportion the First Louisiana Supreme Court in a manner which "fairly recognizes the voting strengths of minorities in the New Orleans area and completely remedies the present dilution of minority voting strength." (Plaintiffs' Complaint, p. 7). Plaintiffs also seek an order requiring compliance with the Voting Rights Act and, finally, a declaration from this Court that the Supreme Court election system violates the Voting Rights Act and the fourteenth and fifteenth amendments to the Federal Constitution.[1]

Defendants do not dispute the figures presented by plaintiffs in their amended complaint. Instead, they contend that section 2 of the Voting Rights Act of 1965, as amended, the fourteenth and fifteenth amendments to the United States Federal Constitution and 42 U.S.C. § 1983 fail to provide plaintiffs grounds upon which relief can be granted for plaintiffs' allegation of diluted black voting strength.

## SECTION 2 OF THE VOTING RIGHTS ACT OF 1965 DOES NOT APPLY TO THE INSTANT ACTION

Prior to 1982, section 2 of the Voting Rights Act (42 U.S.C. § 1973), "Denial or Abridgment of Rights to Vote on Account of Race or Color Through Voting Qualifications or Prerequisites," read as follows:

No voting qualification or prerequisite to voting, or standard, practice, or procedure, shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title.

Section 2 of the Voting Rights Act was amended as a response to *City of Mobile, Alabama v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed. 47 (1980), in which the Supreme Court in a plurality opinion held to establish a violation of section 2 of the Voting Rights Act, minority voters must prove the contested electoral mechanism was intentionally adopted or maintained by state officials for a discriminatory purpose.

---

1. Plaintiffs, earlier, sought a three judge court to hear this complaint which was denied by this Court as the terms of 28 U.S.C. § 2284 provide for a three judge court when the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body is challenged. Nowhere does § 2284 provide for convening a three judge court when a judicial apportionment is challenged.

After *Bolden,* Congress in 1982 revised section 2 to make clear that a violation of the Voting Rights Act could be proven by showing a discriminatory effect or result alone. *United States v. Marengo County Commission,* 731 F.2d 1546 n. 1 (11th Cir. 1984), *appeal dismissed, cert. denied,* 469 U.S. 976, 105 S.Ct. 375, 83 L.Ed.2d 311 (1984).[2] Section 2, as amended, 96 Stat. 134, now reads:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the rights of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2), as provided in subsection (b) of this section.

> (b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination for election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to *elect representatives of their choice.* The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protective class elected in numbers equal to their proportion in the population. 42 U.S.C. § 1973 (emphasis added).

**2.** *See* S.Rep. 97–417, 97 Cong.2d Sess (1982) pp. 15–43, U.S.Code Cong. & Admin.News 1982, p. 177, for a complete discussion of Congress' intent to overturn the section 2 "purposeful discrimination" requirement imposed by *Mobile v. Bolden.*

**3.** *See, e.g., Stokes v. Fortson,* 234 F.Supp. 575 (N.D.Ga.1964) ("Manifestly, judges and prosecutors are not representative in the same sense as they are legislators or the executive. Their function is to administer the law, not to espouse

Prior to the 1982 amendments to section 2, a three-judge court composed of Judges Ainsworth, West and Gordon, headed by Judge West, addressed a voting rights claim arising out of the same claims of discrimination as in this case, albeit not in a section 2 context. *Wells v. Edwards,* 347 F.Supp. 453 (M.D.La.1972), *aff'd,* 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973). In *Wells,* a registered black voter residing in Jefferson Parish, brought suit seeking a reapportionment of the judicial districts from which the seven judges of the Supreme Court of Louisiana are elected. Ms. Wells sought an injunction enjoining the state from holding the scheduled Supreme Court Justice elections and an order compelling the Louisiana Legislature to enact an apportionment plan in accordance with the "one man, one vote" principle and to reschedule the pending election. On cross motions for summary judgment, the three-judge court stated, "We hold that the concept of one-man, one vote apportionment does not apply to the judicial branch of government." 342 F.Supp. at 454. The *Wells* court took notice of *Hadley v. Junior College District,* 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970), in which the Supreme Court held, "Whenever a state or local government decides to select persons by popular election *to perform governmental functions,* the equal protection clause of the fourteenth amendment requires that each qualified voter must be given an equal opportunity to participate in that election....", 90 S.Ct. 791, 795 (emphasis added), but distinguished its holding by outlining the special functions of judges.

The *Wells* court noted many courts' past delineations between elected officials who performed legislative or executive functions and judges who apply, but not create, law [3] and concluded:

a cause of a particular constituency"); *Holshouser v. Scott,* 335 F.Supp. 928 (D.D.C.1971) ("We hold that the one man, one vote rule does not apply to state judiciary...."); *Buchanan v. Rhodes,* 249 F.Supp. 860 (N.D.Ohio 1966) ("Judges do not represent people, they serve people"); *New York State Assn. of Trial Lawyers v. Rockefeller,* 267 F.Supp. 148, 153 (S.D.N.Y. 1967) ("The state judiciary, unlike the legislature, is not the organ responsible for achieving representative government.")

'Judges do not represent people, they serve people.' Thus, the rationale behind the one-man, one-vote principle, which evolved out of efforts to preserve a truly representative form of government, is simply not relevant to the makeup of the judiciary.

347 F.Supp. at 455.

The *Wells* opinion interpreted the "one man one vote" principle prior to the 1982 amendments to section 2, which added the phrase, "[T]o elect representatives of their choice." [4] (*See* emphasis in quotation 42 U.S.C. 1973, *supra.*) The legislative history of the 1982 Voting Rights Act amendments does not yield a definitive statement noting why the word "representative" was added to section 2. However, in this case, no such statement is necessary, as "to elect representatives of their choice" is clear and unambigous.

▪ Judges, by their very definition, do not represent voters but are "appointed [or elected] to preside and to administer the law." *Black's Law Dictionary*, 1968. As statements by Hamilton in the *Federalist*, No. 78 reflect, the distinction between Judge and representative has long been established in American legal history:

> If it be said that the legislative body are themselves the constitutional judges of their own powers, and that the construction they put upon them is conclusive upon the other departments, it may be answered, that this cannot be the natural presumption, where it is not to be collected from any particular provisions in the

constitution. It is not otherwise to be supposed that the constitution could intend to enable the representatives of the people to substitute their will to that of their constituents. It is far more rational to suppose that the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority. The interpretation of the laws is the proper and peculiar province of the courts....

Indeed, our Federal Constitution recognizes the inherent difference between representatives and judges by placing the federal judiciary in an entirely different category from that of other federal elective offices. It is noteworthy that articles 1 and 2, which establish Congress and the Presidency, are lengthy and detailed, while Article 3, which establishes the judiciary, is brief and free of direction, indicating the judiciary is to be free of any instructions. Today, Fifth Circuit jurisprudence continues to recognize the long established distinction between judges and other officials. *See, e.g., Morial v. Judiciary Committee of State of Louisiana,* 565 F.2d 295 (5th Cir.1977) *en banc, cert. denied,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978). (See also Footnote 1, *supra.*)

The legislative history of the Voting Rights Act Amendments does not address the issue of section 2 applying to the judiciary,[5] indeed, most of the discussion con-

---

**4.** This language did not appear in section 2 at the time of the *Wells* opinion.

**5.** The Chairman of the Senate Judiciary Committee's Subcommittee on the Constitution, Senator Orrin Hatch, in voicing his strong opposition of the Legislative reversal of *Bolden* through the section 2 revisions, made a brief reference to section 2 applying to judicial elections:

> Every political subdivision in the United States would be liable to have its electoral practices and procedures evaluated by the proposed results test of section 2. It is important to emphasize at the onset that for the purposes of Section 2, the term "political subdivision" encompasses all governmental units, including city and county councils, school

boards, judicial districts, utility districts, as well as state legislatures.

S.Rep. 97–417, 97 Cong.2d Sess. 127, 151, *reprinted in* 1982 U.S.Code Cong. & Admin.News 298, 323.

Although Senator Hatch's comment indicates coverage of judicial districts by the Voting Rights Act, the purpose of the above passage was to illustrate Senator Hatch's belief that the impact of the section 2 Amendments' "results test" would be far ranging and in his opinion, detrimental. Senator Hatch's comments were included at the end of the Senate report usually reserved for dissenting Senators. The above passage did not portend to be a definative or even a moderately detailed description of the coverage of the Voting Rights Act, nor does Senator Hatch provide any authority for his suggestion of the potential scope of section 2.

cerning the application of the Voting Rights Act refers to legislative offices. Nevertheless plaintiffs ignore the historical distinction between representative and judge and the lack of any discernible legislative history in their favor and argue that the Voting Rights Act is a broad and remedial measure which must be extended to cover judicial election systems.[6] Plaintiffs rely principally on *Haith v. Martin*, 618 F.Supp. 410 (D.N.C.1985) (three-judge court), *aff'd*, without opinion, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986) for the proposition that this Court should ignore *Wells v. Edwards, supra*, and apply section 2 to the allegations contained in their complaint.[7] In *Haith*, the district court held that judicial election systems are covered by section 5 of the Voting Rights Act, which requires preclearance by the U.S. Justice Department of any voting procedures changes in areas with a history of voting discrimination. Plaintiffs, in essence, argue that because the Supreme Court, without opinion, affirmed the *Haith* district court in its application of section 5 to judicial elections, this Court should expand the holding of *Haith* to include section 2 of the Voting Rights Act. Plaintiffs' argument fails because section 5 does not specifically restrict its application to election systems pertaining to representatives, a restriction included in the 1982 amendments to section 2.

Although a potential conflict may develop between the holdings in *Wells* and *Haith, Wells* clearly states the "one man one vote" principle is *not* applicable to judicial elections. This Court recognizes the long standing principle that the judiciary, on all levels, exists to interpret and apply the laws, that is, judge the applicability of laws in specific instances. Representatives of the people, on the other hand, write laws to encompass a wide range of situations. Therefore, decisions by representatives must occur in an environment which takes into account public opinion so that laws promulgated reflect the values of the represented society, as a whole. Judicial decisions which involve the individual or individuals must occur in an environment of impartiality so that courts render judgments which reflect the particular facts and circumstances of distinct cases, and not the sweeping and sometimes undisciplined winds of public opinion.

## PLAINTIFFS' FOURTEENTH AND FIFTEENTH AMENDMENT CLAIMS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AS PLAINTIFFS DO NOT PLEAD DISCRIMINATORY INTENT

The appropriate constitutional standard for establishing a violation of the fourteenth amendment in the context of voting rights is "purposeful discrimination." *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977);[8] *McMillian v. Escambia City, Fla*, 688 F.2d 960 (5th Cir. 1982).[9] Similarly, *City of Mobile, Ala-*

---

Rather, this Court finds that the passage was meant to be argumentative and persuasive, and not as a means to define actual scope of the Act.

**6.** *See e.g., United Jewish Organization of Williamsburg, Inc. v. Carey*, 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) ("It is apparent from the face of the Act, from its legislative history, and from our cases of the Act itself was broadly remedial in the sense that it 'was designed by Congress to banish the blight of racial discrimination in voting ...' "), 430 U.S. at 156, 97 S.Ct. at 1005; *South Carolina v. Katzenback*, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966) (The Voting Rights Act "reflects Congress' firm intention to rid the country of racial discrimination in voting"), 383 U.S. at 315, 86 S.Ct. at 811.

**7.** Plaintiffs also rely on *Kirksey v. Allian*, 658 F.Supp. 1153 (S.D.Ms.1987), in which a district court dismissed the reasoning in *Wells*, and held section 2 does apply to the elected judiciary. *Wells, supra,* has precedential authority and clearly conflicts with *Kirksey*, an untested lower court opinion.

**8.** In *Village of Arlington Heights v. Metropolitan Housing Corp.*, purposeful discrimination was held the standard necessary to establish a violation of the fourteenth amendment where plaintiff claimed a village rezoning decision was racially discriminatory.

**9.** In *McMillian v. Escambia City, Fla.*, the Fifth Circuit held the *Arlington Heights'* "purposeful discrimination" standard is appropriate in fourteenth amendment voter discrimination claims.

*bama v. Bolden, supra,* requires a court to establish a finding of discriminatory purpose before declaring a fifteenth amendment violation of voting rights.[10]

In *Voter Information Project,* 612 F.2d 208 (5th Cir.1980), a panel composed of Judges Jones, Brown and Rubin (opinion by Judge Brown) held a suit that alleged the at-large scheme for electing city judges in Baton Rouge invidiously diluted the voting strength of black persons in violation of the fourteenth and fifteenth amendments to the United States Federal Constitution, and 42 U.S.C. § 1983, could not be dismissed when the complaint alleges purposeful discrimination. At the trial level, Judge West relied on his reasoning in *Wells, supra,* that the one man, one vote principle did not apply to the elections of judges, and dismissed plaintiffs' suit. Judge Brown reversed, holding that the "one man, one vote" principle as espoused in *Wells, supra,* was not enough to dismiss plaintiff's complaint. The *Voter Information Court* found:

> The problem with the District Court's opinion, however, is that it assumes the "one man, one vote" principle was the exclusive theory of plaintiff's complaints. In addition to a rather vaguely formulated "one man, one vote" theory, plaintiffs contend that both in design and operation, the at-large schemes dilute the voting strength of black citizens and prevent blacks from being elected as judges. As the complaint attacking the city judge election system alleges:
>
> 25. The sole purpose of the present at-large system of election of City

Judge is to insure that the white majority will continue to elect all white persons for the offices of City Judge.

> 26. The present at-large system was instituted when "Division B" was created as a reaction to increasing black voter registration and for the express purpose of diluting and minimizing the effect of the increased black vote.
>
> 27. In Baton Rouge, there is a continuing history of "bloc voting" under which when a black candidate opposes a white candidate, the white majority consistently casts its votes for the white candidate, irrespective of the relative qualifications.

Plaintiffs contend that since most of the black population of Baton Rouge and E. Baton Rouge Parish is concentrated in a few geographic areas, black citizens could, under a single member district plan, elect at least some black judges.

612 F.2d at 211.

The *Voter Information Project* Court held the plaintiff's complaint contained sufficient allegations of intentional discrimination against black voters to survive a motion to dismiss: "If plaintiffs can prove that the purpose and operative effect of such purpose of the at-large election schemes in Baton Rouge is to dilute the voting strength of black citizens, then they are entitled to some form of relief." 612 F.2d at 212. Thus, the *Voter Information Project* requires that "purpose and operative effect" be pled in a fourteenth and fifteenth amendment challenge to a judicial apportionment plan.

---

10. Although there is a conflict between the requirement of "discriminatory effect" in Section 2, which is intended to enforce the fifteenth amendment, and the requirement of "purposeful discrimination" for a fifteenth amendment violation standing alone, the Senate Judiciary Committee addressed this point and recognized Congress' limited ability to adjust the burden of proving Voting Rights Violations in its "Voting Rights Act Extension" Committee Report.

Certainly, Congress cannot overturn a substantive interpretation of the Constitution by the Supreme Court. Such rulings can only be altered under our form of government by constitutional amendment or by a subsequent decision by the Supreme Court.

Thus Congress cannot alter the judicial interpretations in *Bolden* of the fourteenth and fifteenth amendments by simple statute. But the proposed amendment to Section 2 does not seek to reverse the court's constitutional interpretation.

S.Rep. 97–417, 97 Cong.2d Sess. (1982), p. 41, U.S.Code Cong. & Admin.News 1982, p. 219. The Supreme Court, the only body empowered to interpret the Federal Constitution, has not seen fit to overrule its repeated determination that the fourteenth and fifteenth mendments claims require "purposeful discrimination."

The complaint in the instant case states, in pertinent part:

> Because of the official history of racial discrimination in Louisiana's First Supreme Court District, the wide spread prevalence of racially polarized voting in the district, the continuing effects of past discrimination on the plaintiffs, the small percentage of minorities elected to public office in the area, the absence of any black elected to the Louisiana Supreme Court from the First District, and the lack of any justifiable reason to continue the practice of electing two Justices at-large from the New Orleans area only, plaintiffs contend that the current election procedures for selecting Supreme Court justices from the New Orleans area dilutes minority voting strength and therefore violates the 1965 Voting Rights Act, as amended.

(See Plaintiffs' Complaint, p. 5). Later on, the Complaint alleges:

> The defendants actions are in violation of the Fourteenth and Fifteenth Amendment to the United States Constitution and 42 U.S.C. § 1983 in that the purpose and effect of their actions is to dilute, minimize, and cancel the voting strength of the plaintiffs.

(*Id.*, p. 6.)

Although "purpose and effect" language in the second quotation above broadly read may imply plaintiffs' intention to plead discriminatory intent, it is this Court's considered opinion, based on the complaint as a whole, that plaintiffs intend to prove this claim based on a theory of "discriminatory effect" and not on a theory of "discriminatory intent." *City of Mobile Alabama v. Bolden, supra.* For example, plaintiffs' complaint does not allege the system by which the Louisiana Supreme Court Justices are elected was instituted with specific intent to discriminate. This contrasts with the specific allegations in *Voter Information Project, supra.* Accordingly, plaintiffs lack the requisite allegations in order to prove a violation of the fourteenth or fifteenth amendment to the Federal Constitution. The Court reserves the right for plaintiffs to reurge its fourteenth and fif-

teenth amendment claims as they relate to the Court's ruling that plaintiffs' complaint only alleges "discriminatory effect."

Accordingly, unless plaintiffs' complaint is amended within ten (10) days of the date of entry of this opinion, the Clerk of Court is directed to enter judgment DISMISSING plaintiffs' claim at their cost.