Ronald **CHISOM**, et al., Plaintiffs–Appellants,

v.

Edwin **EDWARDS**, in his capacity as Governor of the State of Louisiana, et al., Defendants–Appellees.

No. 87–3463.

United States Court of Appeals, Fifth Circuit.

Feb. 29, 1988.

William P. Quigley, Ron Wilson, New Orleans, La., for plaintiffs-appellants.

Mark L. Gross, Justice Dept., Jessica Dunsay Silver, Washington, D.C., for amicus U.S.

Pamela S. Karlan, Charles Stephen Ralston, New York City, for Chisom Group.

Michael H. Rubin, Baton Rouge, La., Kendall L. Vick, Asst. Atty. Gen., La. Dept. of Justice, M. Truman Woodward, Jr., New Orleans, La., for amicus LDJA.

Michael B. Wallace, Jackson, Miss., Daniel J. Popeo, Washington Legal Foundation, Washington, D.C., A.R. Christovich, Jr., Moise W. Dennery, New Orleans, La., for amicus Washington Legal and Allied Ed.

John L. Maxey, II, Special Counsel, Stephen J. Kirchmayr, Deputy Atty. Gen., Hubbard T. Saunders, IV, Jackson, Miss., for amicus State of Miss.

Before BROWN, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

JOHNSON, Circuit Judge:

Plaintiffs, black registered voters in Orleans Parish, Louisiana, raise constitutional challenges to the present system of electing Louisiana Supreme Court Justices from the First Supreme Court District. Plaintiffs allege that the current at-large system of electing Justices from the First District impermissibly dilutes the voting strength of black voters in Orleans Parish in violation of Section 2 of the Voting Rights Act of 1965, as amended in 1982 and the fourteenth and fifteenth amendments. The district court dismissed the section 2 claim pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, finding that section 2 does not apply to the election of state judges. Concluding that section 2 does so apply, we reverse.

The primary issue before this Court is whether section 2 of the Voting Rights Act applies to state judicial elections.

## I. FACTS AND PROCEDURAL HISTORY

The facts are undisputed. Currently, the seven Justices on the Supreme Court of Louisiana are elected from six geographical judicial districts. Five of the six districts elect one Justice each. However, the First District, comprised of four parishes (Orleans, St. Bernard, Plaquemines, and Jefferson Parishes), elects two Justices at-large.

The population of the four parish First Supreme Court District is approximately thirty-four percent black and sixty-three percent white. The registered voter population reveals a somewhat similar percentage breakdown, with approximately thirty-two percent black and sixty-eight percent white. Over half of the four parish First Supreme Court District's population and over half of the district's registered voters live in Orleans Parish. Importantly, Orleans Parish has a fifty-five percent black population and a fifty-two percent black registered voter population. Plaintiffs seek a division of the First District into two single-member districts, each to elect one Justice. Under the plaintiffs' plan of divi-

sion, one proposed district would be composed of Orleans Parish with a greater black population and black registered voter population than white. The other proposed district would be composed of Jefferson, Plaquemines, and St. Bernard Parishes; this district would have a substantially greater white population and white registered voter population than black. It is particularly significant that no black person has ever been elected to the Louisiana Supreme Court, either from the First Supreme Court District or from any one of the other five judicial districts.

To support their voter dilution claim, plaintiffs cite, among other factors, a history of purposeful official discrimination on the basis of race in Louisiana and the existence of widespread racially polarized voting in elections involving black and white candidates. Specifically, plaintiffs allege in their complaint:

Because of the offical history of racial discrimination in Louisiana's First Supreme Court District, the wide spread prevalence of racially polarized voting in the district, the continuing effects of past discrimination on the plaintiffs, the small percentage of minorities elected to public office in the area, the absence of any blacks elected to the Louisiana Supreme Court from the First District, and the lack of any justifiable reason to continue the practice of electing two Justices at-large from the New Orleans area only, plaintiffs contend that the current election procedures for selecting Supreme Court Justices from the New Orleans area dilutes minority voting strength and therefore violates the 1965 Voting Rights Act, as amended.

On May 1, 1987, the district court, 659 F.Supp. 183, dismissed plaintiffs' complaint for failure to state a claim upon which relief may be granted. In its opinion accompanying the dismissal order, the district court concluded that section 2 of the Voting Rights Act does not apply to the election of state judges. To support this conclusion, the district court relied primarily on the amended language in section 2 which states "to elect representatives of their choice." The district court reasoned that since judges are not "representatives," judicial elections are therefore not within the protective ambit of section 2. Focusing on a perceived inherent difference between representatives and judges, the district court stated, "[j]udges, by their very definition, do not represent voters but are 'appointed [or elected] to preside and administer the law.'" (citation omitted). The district court further relied on what was understood to be a lack of any reference to judicial elections in the legislative history of section 2, and on previous court decisions establishing that the "one person, one vote" principle does not apply to judicial elections. As to plaintiffs' fourteenth and fifteenth amendment challenges, the district court determined that plaintiffs had failed to plead an intent to discriminate with sufficient specificity to support their constitutional claims. Plaintiffs appeal the district court's dismissal of both their statutory and constitutional claims.

In an opinion just released, the Sixth Circuit, addressing a complaint that the present system of electing municipal judges to the Hamilton County Municipal Court in Ohio violates section 2, concluded that section 2 does indeed apply to the judiciary. *Mallory v. Eyrich*, 839 F.2d 275 (6th Cir.1988). Other than our district court, only two district courts have ruled on the coverage of section 2 in this context. The *Mallory* district court, subsequently reversed, concluded that section 2 does not extend to the judiciary. *Mallory v. Eyrich*, 666 F.Supp. 1060 (S.D. Ohio 1987). The other district court, *Martin v. Allain*, 658 F.Supp. 1183 (S.D.Miss. 1987), determined that section 2 does apply to the judicial branch. After consideration of the language of the Act itself; the policies behind the enactment of section 2; pertinent legislative history; previous judicial interpretations of section 5, a companion section to section 2 in the Act; and the position of the United States Attorney General on this issue; we conclude that section 2 does apply to the election of state court judges. We therefore reverse the judgment of the district court.

## II. DISCUSSION

### A. *The Plain Language of the Act*

The Voting Rights Act was enacted by Congress in 1965 for a broad remedial purpose—"to rid the country of racial discrimination in voting." *South Carolina v. Katzenbach,* 383 U.S. 301, 315, 86 S.Ct. 803, 812, 15 L.Ed.2d 769 (1966). Since the inception of the Act, the Supreme Court has consistently interpreted the Act in a manner which affords it "the broadest possible scope" in combatting racial discrimination. *Allen v. State Board of Elections,* 393 U.S. 544, 565, 89 S.Ct. 817, 831, 22 L.Ed.2d 1 (1969). As a result, the Act effectively regulates a wide range of voting practices and procedures. *See United States v. Sheffield Board of Commissioners,* 435 U.S. 110, 122–23, 98 S.Ct. 965, 974–75, 55 L.Ed.2d 148 (1978). Referred to by the Supreme Court as a provision which "broadly prohibits the use of voting rules to abridge exercise of the franchise on racial grounds," *Katzenbach,* 383 U.S. at 316, 86 S.Ct. at 812, section 2 of the Voting Rights Act of 1965, prior to its amendment in 1982, provided as follows:

> No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title.

Congress amended section 2 in 1982 in response to the Supreme Court's decision in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), wherein the Court concluded that section 2 operated to prohibit only intentional acts of discrimination by state officials. In disagreement with the high court's pronouncement, Congress amended section 2 with language providing that proof of intent is not required to successfully prove a section 2 violation. Instead, Congress adopted the "results" test, whereby plaintiffs may prevail under section 2 by demonstrating that, under the totality of the circumstances, a challenged election law or procedure has the effect of denying or abridging the right to vote on the basis of race. However, while effecting significant change through the 1982 amendments, Congress specifically retained the operative language of original section 2 defining the section's coverage—"[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed...." Section 2, as amended in 1982, now provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Section 14(c)(1), which defines "voting" and "vote" for purposes of the Act, sets forth the types of election practices and elections which are encompassed within the regulatory sphere of the Act. Section 14(c)(1) states,

> The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this

subchapter or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

Clearly, judges are "candidates for public or party office" elected in a primary, special, or general election; therefore, section 2, by its express terms, extends to state judicial elections. This truly is the only construction consistent with the plain language of the Act.[1]

In *Dillard v. Crenshaw County*, 831 F.2d 246 (11th Cir.1987), the Eleventh Circuit addressed the issue of the coverage of section 2. In *Dillard*, the court rejected the defendant county's implicit argument that the election of an at-large chairperson of a county commission was not covered by section 2 due to that position's administrative, as opposed to legislative, character. The *Dillard* court stated,

> Nowhere in the language of Section 2 nor in the legislative history does Congress condition the applicability of Section 2 on the function performed by an elected official. The language is only and uncompromisingly premised on the fact of nomination or election. Thus, on the face of Section 2 it is irrelevant that the chairperson performs only administrative and executive duties. It is only relevant that Calhoun County has expressed an interest in retaining the post as an electoral position. Once a post is open to the electorate, and if it is shown that the context of that election creates a discriminatory but corrigible election practice, it must be open in a way that allows racial groups to participate equally.

*Id.* at 250.

The State asserts that by amending section 2 in 1982, Congress intentionally grafted a limitation on section 14(c)(1) that "candidates for public or party office" only

include "representatives"; since judges are not "representatives," state judicial elections are exempt from the protective measures of the Act. In making this contention, the State, as well as the district court, points to the distinctive functions of judges as opposed to other elected officials. Specifically, the district court, citing *Wells v. Edwards*, 347 F.Supp. 453 (M.D.La. 1972), *aff'd*, 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed. 2d 679 (1973), notes that the "one person, one vote" principle of apportionment has been held not to apply to the judicial branch of government on the basis of this distinction. *See also Voter Information Project v. City of Baton Rouge*, 612 F.2d 208 (5th Cir.1980). In *Wells*, the plaintiff sought reapportionment of the Louisiana Supreme Court Judicial Districts in accordance with one person, one vote principles. The *Wells* court rejected the plaintiff's claim, reasoning that the "primary purpose of one-man, one-vote apportionment is to make sure that each official member of an elected body speaks for approximately the same number of constituents." *Wells*, 347 F.Supp. at 455. The district court then concluded that since judges do not represent, but instead serve people, the rationale behind one person, one vote apportionment of preserving a representative form of government is not relevant to the judiciary. *Id.*

In *Voter Information*, this Court, bound by the holding in *Wells* due to the Supreme Court's summary affirmance of that decision, rejected the plaintiffs' claim for reapportionment of judicial districts on the one person, one vote theory. *Voter Information*, 612 F.2d at 211. However, the *Voter Information* Court then emphasized that the plaintiffs further asserted claims of racial discrimination under the fifteenth amendment which resulted in the dilution of black voting strength. Recognizing the difference between the two types of claims, the Court expressly rejected the applicability of the *Wells* decision to claims of racial discrimination, stating,

---

**1.** Evidence of congressional intent to reach all types of elections, regardless of who or what is the object of the vote, is the fact that votes on

*propositions* are within the purview of the Act. Section 14(c)(1).

[T]he various 'one man one vote' cases involving Judges make clear that they do *not* involve claims of race discrimination as such.

To hold that a system designed to dilute the voting strength of black citizens and prevent the election of blacks as Judges is immune from attack would be to ignore both the language and purpose of the Fourteenth and Fifteenth Amendments. The Supreme Court has frequently recognized that election schemes not otherwise subject to attack may be unconstitutional when designed and operated to discriminate against racial minorities.

*Id.* (footnote omitted).

We, like the *Voter Information* Court, are bound by the Supreme Court's affirmance of *Wells* and its holding that the one person, one vote principle does not extend to the judicial branch of government. However, the district court's reliance on *Wells* in the instant case is misplaced as we are not concerned with a complaint seeking reapportionment of judicial districts on the basis of population deviations between districts. Rather, the complaint in the instant case involves claims of racial discrimination resulting in vote dilution under section 2 of the Voting Rights Act and the fourteenth and fifteenth amendments. Therefore, the district court erred to the extent it relied on *Wells* in support of its conclusion that section 2 does not apply to the judiciary.[2]

The Voting Rights Act was enacted, in part, to facilitate the enforcement of the guarantees afforded by the Constitution. Indeed, section 2, as originally written, no more than elaborated on the fifteenth amendment, providing statutory protection consonant with that of the constitutional guarantee. *Mobile*, 446 U.S. at 60, 100

S.Ct. at 1496. Therefore, the reasoning utilized by the Court in *Voter Information* to extend the protection from racial discrimination provided by the fourteenth and fifteenth amendments to the judiciary compels a conclusion by this Court that the protection from racial discrimination provided by section 2 likewise extends to state judicial elections.

It is difficult, if not impossible, for this Court to conceive of Congress, in an express attempt to expand the coverage of the Voting Rights Act, to have in fact amended the Act in a manner affording minorities less protection from racial discrimination than that provided by the Constitution. We conclude today that section 2, as amended in 1982, provides protection commensurate with the fourteenth and fifteenth amendments; therefore, in accordance with this Court's decision in *Voter Information*, section 2 necessarily embraces judicial elections within its scope. Any other construction of section 2 would be wholly inconsistent with the plain language of the Act and the express purpose which Congress sought to attain in amending section 2; that is, to expand the protection of the Act.

### B. *The Legislative History of Section 2*

Our conclusion today finds further support in the legislative history of the 1982 amendments to section 2. An overriding principle which guides any analysis of the legislative history behind the Voting Rights Act is that the Act must be interpreted in a broad and comprehensive manner in accordance with congressional intent to combat racial discrimination of any kind in all voting practices and procedures. Thus, in the absence of *any* legislative history warranting a conclusion that section 2 does not

---

**2.** The distinction between equal protection principles applicable to claims based on one person, one vote principles of apportionment and those based on racial discrimination is not without prior Supreme Court precedent. *See White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) (Court reversed decision of district court that reapportionment plan for Texas House of Representatives violated one person, one vote principles, but affirmed the district court's conclusion that a particular portion of

the plan unlawfully diluted minority voting strength.). *See also Gaffney v. Cummings*, 412 U.S. 735, 751, 93 S.Ct. 2321, 2330, 37 L.Ed.2d 298 (1973) ("A districting plan may create multimember districts perfectly acceptable under equal population standards, but invidiously discriminatory because they are employed 'to minimize or cancel out the voting strength of racial or political elements of the voting population.'") (citations omitted).

apply to state judicial elections, the only acceptable interpretation of the Act is that such elections are so covered. *See Sheffield,* 435 U.S. 110, 98 S.Ct. 965.[3]

As previously noted, Congress amended section 2 in direct response to the Supreme Court's decision in *Mobile v. Bolden,*

> The Senate Report states that amended [section] 2 was designed to restore the "results test"—the legal standard that governed voting discrimination cases prior to our decision in *Mobile v. Bolden.* .... Under the "results test," plaintiffs are not required to demonstrate that the challenged electoral law or structure was designed or maintained for a discriminatory purpose.

*Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 2763 n. 8, 92 L.Ed.2d 25 (1986) (citations omitted). In amending section 2, Congress preserved the operative language of subsection (a) defining the coverage of the Act and merely added subsection (b) to adopt the "results test" for proving a violation of section 2. In fact, the language added by Congress in subsection (b)—"to participate in the political process and to elect representatives of their choice"—is derived almost verbatim from the Supreme Court's standard governing claims of vote dilution on the basis of race set forth in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), prior to *Mobile v. Bolden. See* S.Rep.No. 417, 97th Cong., 2d Sess. 27, *reprinted in* 1982 U.S. Code Cong. & Admin. News 177, 205 (Congress' stated purpose in adding subsection (b) was to "embod[y] the test laid down by the Supreme Court in *White*."). In *White,* the Court stated "[t]he plaintiffs' burden is to produce evidence ... that [the minority groups'] members had less opportunity

than did other residents in the district to participate in the political processes and to elect legislators of their choice." *Id.* at 766, 93 S.Ct. at 2339.[4]

Further, contrary to the statement in the district court's opinion that the legislative history of the 1982 amendments does not address the issue of section 2 applying to the judiciary, Senator Orrin Hatch, in comments contained in the Senate Report, stated that the term " 'political subdivision' encompasses *all* governmental units, including city and county councils, school boards, *judicial districts,* utility districts, as well as state legislatures." S.Rep. 417 at 151, 1982 U.S.Code Cong. & Admin. News 323 (emphasis added). While the above statement by Senator Hatch is not a definitive description of the scope of the Act, we believe the statement provides persuasive evidence of congressional understanding and belief that section 2 applies to the judiciary, especially since the Report is silent as to any dissent by senators from Senator Hatch's description.

Additionally, the Senate and House hearings on the various bills regarding the extension of the Voting Rights Act in 1982 are replete with references to the election of judicial officials under the Act. The references primarily occur in the context of statistics presented to Congress indicating advances or setbacks of minorities under the Act. The statistics chart the election of minorities to various elected positions, including judges. *See Extension of the Voting Rights Act: Hearings on H.R. 1407, H.R. 1731, H.R. 2942, and H.R. 3112, H.R. 3198, H.R. 3473 and H.R. 3498 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judi-*

---

**3.** In *Sheffield,* the Supreme Court declined to adopt a narrowing construction of § 5 and the preclearance requirements of the Act whereby § 5 would cover only counties and political units that conduct voter registration. "[I]n view of the structure of the Act, it would be unthinkable to adopt the District Court's construction unless there were persuasive evidence either that § 5 was intended to apply only to changes affecting the registration process or that Congress clearly manifested an intention to restrict § 5 coverage...." 435 U.S. at 122, 98 S.Ct. at 974.

**4.** It might be argued that since the Supreme Court used the term "legislators" and Congress chose "representatives," Congress thereby rejected language limiting the coverage of § 2 to legislators. The better analysis is that Congress did not use the term "representatives" with a specific intent to limit the section's application to any elected officials. Had Congress wished to do so, it could have easily promulgated express language to effectuate that intent.

*ciary,* 97th Cong.1st sess. 38, 193, 239, 280, 503, 574, 804, 937, 1182, 1188, 1515, 1528, 1535, 1745, 1839, 2647 (1981); *Voting Rights Act: Hearings on S. 53, S. 1761, S. 1975, S. 1992, and H.R. 3112 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary,* 97th Cong.2d Sess. 669, 748, 788–89 (1982). Once again, the legislative history does not reveal any dissent from the proposition that such statistics were properly considered by Congress in amending the Act. Finally, throughout the Senate Report on the 1982 amendments to section 2, Congress uses the terms "officials," "candidates," and "representatives" interchangeably when explaining the meaning and purpose of the Act. This lack of any consistent use of the term "representatives" indicates that Congress did not intentionally choose that term in an effort to exclude certain types of elected officials from the coverage of the Act.

In contrast to the examples of legislative history which plaintiffs cite in support of their position that section 2 applies to state judicial elections, the State offers no convincing evidence in the legislative history contrary to the plaintiff's interpretation of the Act. Instead, the State relies primarily on the plain meaning of the word "representative" to assert that judges are exempt from the Act. The State's position is untenable.[5] Judges, while not "representatives" in the traditional sense, do indeed reflect the sentiment of the majority of the people as to the individuals they choose to entrust with the responsibility of administering the law. As the district court held in *Martin v. Allain:*

> [J]udges do not "represent" those who elect them in the same context as legislators represent their constituents. The

use of the word "representatives" in Section 2 is not restricted to legislative representatives but denotes anyone selected or chosen by popular election from among a field of candidates to fill an office, including judges.

658 F.Supp. at 1200.

### C. *Section 5 and Section 2*

The plaintiffs further support their position that judicial elections are covered by section 2 by citing to the recent case of *Haith v. Martin,* 618 F.Supp. 410 (E.D.N.C. 1985), *aff'd,* 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986), wherein the district court held that judicial elections are covered by section 5 and the preclearance requirements of the Act. In *Haith,* the defendant state officials sought to exempt the election of superior court judges in North Carolina from the preclearance requirements of section 5 by relying on the cases holding that the one person, one vote principle does not apply to the judicial branch of government. In an analysis strikingly similar to that employed by the Court in *Voter Information,* the district court in *Haith* rejected the defendants' arguments as misplaced due to the fact that the plaintiff's claim was one based on discrimination, not malapportionment. The *Haith* court stated "[a]s can be seen, the Act applies to all *voting* without any limitation as to who, or what, is the object of the vote." 618 F.Supp. at 413. *See also Kirksey v. Allain,* 635 F.Supp. 347, 349 (S.D. Miss.1986) ("Given the expansive interpretation of the Voting Rights Act and § 5, this Court is compelled to agree with the pronouncement in *Haith v. Martin*" that section 5 applies to the judiciary.).

---

**5.** The State asserts that the Dole compromise prohibiting proportional representation evidences congressional intent that § 2 only apply to legislative officials. Proportional representation, the State continues, is relevant to the legislature; therefore, Congress intended § 2 to apply only to the election of legislators. However, what belies the State's argument is that proportional representation may occur in any election wherein the people elect individuals to comprise a group. For instance, Louisiana elects seven Justices to comprise the Supreme Court. Certainly, the prohibition on proportional representation in § 2(b) applies in such a situation to prevent a legal requirement that the number of blacks on the Louisiana Supreme Court correspond to the percentage of blacks in the Louisiana population. Moreover, the State conceded at oral argument that executive officials could be covered by § 2, underlying their assertion that congressional fear of proportional representation evidenced intent that § 2 only apply to the legislature.

In the instant case, the State argues that the Supreme Court's affirmance of *Haith* does not compel a conclusion that section 2 applies to judicial elections as section 5 involves the mechanics of voting, while section 2 involves the fundamental right to vote for those who govern. We reject this asserted distinction. If, for instance, Louisiana were to enact an election statute providing that no blacks would be able to vote in elections for Louisiana Supreme Court Justices, it is undisputed, after *Haith*, that such a statute would be invalidated under the preclearance requirements of section 5. To hold, as the State asserts, that such an egregious statute would not be subject to the requirements of section 2 as well would lead to the incongruous result that, while Louisiana could not adopt such a statute in 1988, if that statute were in effect prior to 1982, minorities could only challenge the statute under the Constitution and not the Voting Rights Act. Such a result would be totally inconsistent with the broad remedial purpose of the Act. Moreover, section 5 and section 2, virtually companion sections, operate in tandem to prohibit discriminatory practices in voting, whether those practices originate in the past, present, or future. Section 5 contains virtually identical language defining its scope to that of section 2—"any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting...." Therefore, statutory construction, consistency, and practicality point inexorably to the conclusion that if section 5 applies to the judiciary, section 2 must also apply to the judiciary. *See Pampanga Mills v. Trinidad,* 279 U.S. 211, 217–18, 49 S.Ct. 308, 310, 73 L.Ed. 665 (1929).

### D. *The Attorney General's Interpretation*

In *United States v. Sheffield Board of Commissioners,* 435 U.S. at 131, 98 S.Ct. at 979, the Supreme Court concluded that the contemporaneous construction of the Act by the Attorney General is persuasive evidence of the original congressional understanding of the Act, "especially in light of the extensive role the Attorney General played in drafting the statute and explaining its operation to Congress." Since its inception, the Attorney General has consistently supported an expansive, not restrictive, construction of the Act. Testifying at congressional hearings prior to the passage of the Act in 1965, the Attorney General stated that "every election in which registered voters are permitted to vote would be covered" by the Act. *Voting Rights: Hearing Before Subcomm. No. 5 of the House Judiciary Comm.,* 89th Cong. 1st Sess. (1965), at 21. *See also Allen,* 393 U.S. at 566–67, 89 S.Ct. at 832–33. Continuing the trend of broadly interpreting the Act to further its remedial purpose, the Attorney General has filed an amicus curiae brief in the instant case in which he maintains that the "plain meaning of [the language in section 2] reaches all elections, including judicial elections" and that the pre-existing coverage of section 2 was not limited by the 1982 congressional amendments. This construction of the Act by the Attorney General further bolsters our holding today that section 2 does apply to state judicial elections.

### E. *Plaintiffs' Constitutional Claims*

Plaintiffs also appeal the district court's dismissal of their constitutional claims for failure to plead specific discriminatory intent. In their complaint, plaintiffs allege, in pertinent part:

> The defendant's actions are in violation of the Fourteenth and Fifteenth amendments to the United States Constitution and 42 U.S.C. Section 1983 in that the purposes and effect of their actions is to dilute, minimize, and cancel the voting strength of the plaintiffs.

In the instant case, the district court was correct in concluding that discriminatory purpose is a prerequisite to recovery under the fourteenth and fifteenth amendments. *See Washington v. Davis,* 426 U.S. 229, 239–41, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976). However, the district court erred in finding that plaintiffs' complaint did not establish a theory of "discriminatory intent." In *Voter Information,* this Court held that if "plaintiffs can prove that the purpose and opera-

tive effect of such purpose" of the challenged electoral practices is to dilute minority voting strength, the plaintiffs are entitled to some form of relief. *Voter Information,* 612 F.2d at 212. When compared with the complaint in *Voter Information,* the plaintiffs' complaint in the instant case is sufficient to raise a claim of racial discrimination under the fourteenth and fifteenth amendments.[6]

## III. CONCLUSION

Where racial discrimination exists, it is not confined to elections for legislative and executive officials; in such instance, it extends throughout the entire electoral spectrum. Minorities may not be prevented from using section 2 in their efforts to combat racial discrimination in the election of state judges; a contrary result would prohibit minorities from achieving an effective voice in choosing those individuals society elects to administer and interpret the law. The right to vote, the right to an effective voice in our society, cannot be impaired on the basis of race in any instance wherein the will of the majority is expressed by popular vote.

For the reasons set forth above, we reverse the judgment of the district court and remand for proceedings not inconsistent with this opinion.

**REVERSED AND REMANDED.**

---

**6.** In *Voter Information,* the plaintiffs' complaint alleged,

25. The sole purpose of the present at-large system of election of City Judge is to ensure that the white majority will continue to elect all white persons for the office of City Judge.

26. The present at-large system was instituted when "Division B" was created as a reaction to increasing black voter registration and for the express purpose of diluting and minimizing the effect of the increased black vote.

27. In Baton Rouge, there is a continuing history of "bloc voting" under which when a black candidate opposes a white candidate, the white majority consistently casts its votes for the white candidate, irrespective of relative qualifications.

612 F.2d at 211.