**Ronald CHISOM, et al.**

v.

**Edwin EDWARDS, et al.**

**Civ. A. No. 86–4075.**

United States District Court,
E.D. Louisiana.

July 7, 1988.

As Amended July 28, 1988.

William Quigley, New Orleans, La., Pamela S. Karlan, New York City, for plaintiffs.

Robert G. Pugh, Shreveport, La., for defendants.

Peter C. Butler, New Orleans, La., for Justice Walter F. Marcus Jr., Associate Justice of the Louisiana Supreme Court, amicus curiae.

Charles A. Kronlage Jr., New Orleans, La., for Justice Pascal F. Calogero Jr., Associate Justice of the Louisiana Supreme Court, amicus curiae.

Ira J. Rosenzweig, New Orleans, La., for John A. Dixon Jr., Chief Justice of the Louisiana Supreme Court, amicus curiae.

## OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This matter came before the Court on June 29, 1988 for hearing on plaintiff's motion for preliminary injunction. For the following reasons, the Court now GRANTS the motion.

This is a voting discrimination case. Plaintiffs allege that the present system for electing the two Louisiana Supreme Court Justices from New Orleans area improperly dilutes the voting strength of black Orleans Parish voters. Plaintiffs now seek to enjoin the upcoming election on October 1, 1988 for one of the two seats.

Because the Court finds a substantial likelihood, based on solely on the limited evidence presented and as discussed below, that plaintiffs will succeed on the merits and finds it would be grossly unfair to the public, including the plaintiffs, to permit the election to proceed, the Court exercises its discretion to grant the preliminary injunction pending the final resolution on the merits.

Having considered the stipulations made, the affidavits presented, the record, the arguments of counsel, the briefs of the *amici curiae*, and the applicable law, the Court rules as follows. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as conclusions of law; to the extent any of the following conclusions of law constitute findings of fact, they are adopted as findings of fact.

### I.

The fifty United States have a large array of methods for selecting their judicial branches. These methods range from gubernatorial appointments to "Missouri-Plan" appointments with noncompetitive retention elections to legislative elections to nonpartisan elections to partisan elections. The vast majority of states (38 states) choose their judiciary through elective systems for at least a portion of their judicial posts. Louisiana chooses all its judiciary through nonpartisan elections.

Louisiana has had eleven State Constitutions. Five of these have provided for appointive systems in selecting the justices to the Louisiana Supreme Court,[1] while an equal number (including the present Constitution of 1974) has provided for elective systems;[2] the remaining one provided for an appointive system, but was later amended to provide for an elective system.[3] The present constitutional provisions received pre-clearance approval by the U.S. Attorney General pursuant to section 5 of the Voting Rights Act.[4]

1. La. Const. of 1812, art. 3, § 9; La. Const. of 1845, art. 50; La. Const. of 1864, art. 79; La. Const. of 1868, art. 75; La. Const. of 1879, art. 82.

2. La. Const. of 1852, art. 63; La. Const. of 1861, art. 63; La. Const. 1913, art. 86; La. Const. of 1921, art. 7, § 7; La. Const. of 1974, art. 5, § 22(A).

3. La. Const. of 1898, art. 86, as amended in 1904.

4. 42 U.S.C. § 1973c (1982). On November 26, 1974, J. Stanley Pettinger, Assistant Attorney General for the Civil Rights Division, U.S. Department of Justice, sent the following two-paragraph letter to Kenneth C. DeJean, Assistant Attorney General, Louisiana Department of Justice:

This is in reference to your submission of the Louisiana State Constitution submitted to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965. Your submission was received complete (with the exception of [an immaterial portion of 1974 Constitution] ), on October 3, 1974.

The Attorney General does not interpose an objection to the completed part of the submission. However, no decision yet can be made with regard to [the immaterial portion]. We

The Louisiana Supreme Court presently consists of seven justices.[5] The justices are elected from six Supreme Court Districts,[6] and each serves for terms of ten years.[7] Five of the districts elect one justice each, but one district—the First Supreme Court District—elects two justices.[8]

The First Supreme Court District covers an area around metropolitan New Orleans; specifically, it consists of the parishes of Orleans, St. Bernard, Plaquemines, and Jefferson.[9] The two judicial seats assigned to this district are not filled in the same election year. The term on one of these seats, the one presently held by Justice Pascal F. Calogero Jr., is scheduled to expire on December 31, 1988 and to be filled by election on October 1, 1988; the term on the other, presently held by Justice Walter F. Marcus Jr., is scheduled to expire on December 31, 1990 and to be filled by election in the fall of 1990.

Earlier this year, during the current state legislative session, Representative Bruneau introduced House Bill No. 1630, which would create seven new single-member districts for the Louisiana Supreme Court; this bill would divide Orleans Parish so as to become parts of two new districts. It appears that another bill, providing for a "Missouri–Plan" system for selecting Louisiana's justices, has been proposed this year, that a house committee passed on the bill favorably by a four-to-one majority on May 30, that the bill came up for vote in the House that same day but failed for being four votes short of the necessary

two-thirds majority,[10] and that the bill remains viable but with no further action thereon having been taken since May 30.

According to the 1980 Census, the total population of the First Supreme Court District is as follows:

|  | Total | % Black |
| --- | --- | --- |
| Orleans Parish | 557,515 | 55.25% |
| Jefferson Parish | 454,592 | 13.89% |
| St. Bernard Parish | 64,097 | 3.73% |
| Plaquemines Parish | 26,049 | 21.12% |
| TOTAL | 1,102,253 | 34.39% |

According to the Louisiana Elections Commissioner, the following figures reflect the district's number of registered voters by race as of March 31, 1987:

|  | Total | White | Black | % Black |
| --- | --- | --- | --- | --- |
| Orleans Parish | 251,359 | 118,232 | 131,726 | 52.4% |
| Jefferson Parish | 199,534 | 174,742 | 23,825 | 11.9% |
| St. Bernard Parish | 40,086 | 38,508 | 1,577 | 3.9% |
| Plaquemines Parish | 15,198 | 11,376 | 2,825 | 18.6% |
| TOTAL | 506,177 | 342,858 | 159,953 | 31.6% |

According to the 1980 Census, the total populations and racial breakdowns of the six Supreme Court Districts are as follows:

| District | Total Pop. | White | % White | Black | % Black |
| --- | --- | --- | --- | --- | --- |
| 1 | 1,102,253 | 698,418 | 63.4% | 379,101 | 34.4% |
| 2 | 582,223 | 386,283 | 66.3% | 188,490 | 32.4% |
| 3 | 692,974 | 537,586 | 77.6% | 150,036 | 21.7% |
| 4 | 410,850 | 274,007 | 66.7% | 134,534 | 32.7% |
| 5 | 861,217 | 596,972 | 69.3% | 256,523 | 29.8% |
| 6 | 556,383 | 418,906 | 75.3% | 129,557 | 23.3% |
| TOTAL | 4,205,900 | 2,912,172 | 69.2% | 1,238,241 | 29.4% |

According to the 1980 Census, certain statistics for Orleans Parish are as follows:

|  | for whites | for blacks |
| --- | --- | --- |
| Persons age 25 or over who were high school graduates | 70.8% | 46.9% |

feel a responsibility to point out that the failure of the Attorney General to object to the completed part of the submission does not bar any subsequent judicial action to enjoin the enforcement of such changes. We also would like to call to your attention [information about the immaterial portion].

**5.** La. Const. of 1974, art. 5, § 3; La.Rev.Stat. Ann. § 13:101 (West 1983).

**6.** La. Const. of 1974, art. 5, § 22(A); La.RSA § 13:101. While the provision in the 1974 Constitution on selecting judiciary members does not specifically refer to "justices," but rather only to "judges," the term "judges" as used in § 22(A) appears to apply equally to Louisiana Supreme Court justices as well. *See Calogero v. State ex rel. Treen,* 445 So.2d 736, 737–38 (La. 1984); *id.* at 741 (Marcus, J., dissenting) ("Un-

der the new constitution, the term of a supreme court 'judge' shall be ten years."); *see also* La. Const. of 1974, art. 5, § 4 (referring to supreme court members as "judges"); *id.* art. 5, § 22(B) (this subsection on vacancies "in the office of a judge" provides for vacancies "on the supreme court); La.RSA § 13:74 (referring to both "judges of the supreme court" and "the chief justice").

**7.** La. Const. of 1974, art. 5, § 3.

**8.** *Id.* art. 5, § 4 (incorporating La. Const. of 1921, art. 7, § 9); La.RSA § 13:101.

**9.** *Id.* (incorporating La. Const. of 1921, art. 7, § 9); La.RSA § 13:101(1).

**10.** *See* La. Const. of 1974, art. 5, § 4.

| | for whites | for blacks |
|---|---|---|
| Persons age 25 or over who had completed fewer than eight years of school | 11.2% | 21.8% |
| Per capita income | $9,781 | $3,985 |
| Median household income | $15,605 | $8,847 |
| Mean household income | $21,975 | $12,159 |
| Median family income | $21,544 | $10,516 |
| Mean family income | $28,496 | $13,727 |
| Families with incomes in 1979 below the poverty level | 7.4% | 33.4% |
| Persons with incomes in 1979 below the poverty level | 11.5% | 37.3% |
| Persons with incomes in 1979 that were below 75% of the poverty level | 8.0% | 29.1% |
| Housing units with no telephones | 6.8% | 14.2% |
| Housing units with no vehicle available | 20.8% | 42.4% |

At present, blacks represent a majority of the total population, the voting-age population, and the registered voters in Orleans Parish.

In *Major v. Treen*,[11] a state-wide case under section 5 of the Voting Rights Act, the court found the following: In 1898, Louisiana imposed property and educational qualifications on the franchise.[12] Further, in 1898, Louisiana adopted a "grandfather clause" for the purpose of allowing whites who did not otherwise qualify for registration, but not similar blacks, to vote.[13] In 1923, Louisiana authorized the use of white-only primaries, which continued until such use was struck down by the U.S. Supreme Court in 1944.[14] In the 1950s, Louisiana adopted citizenship tests and anti-single-shot provisions.[15] In 1959, Louisiana established a majority-vote requirement for election to party committees. Each of these acts, the court found, was instituted in part to diminish the political power of black residents.[16]

The court further found the following: Voting in elections involving black candidates for political office in Orleans Parish, including elections involving black candidates seeking judicial office, reflect a substantial correlation between the race of voters and the selection of certain candidates.[17] White voters within the First District generally do not support black candidates, and vice versa, in elections involving both black and white candidates.[18]

The court further found the following: Louisiana enforced a *de jure* policy of racial segregation in public education, transportation, and accommodations until these practices were outlawed by the Supreme Court and Congress.[19] Until at least 1981, Louisiana operated a dual public university system.[20] Until the late 1960s, public facilities in Louisiana were segregated.[21] The population growth of the suburban parishes adjacent to Orleans Parish was partly due to the exodus from New Orleans of white families seeking to avoid court-ordered desegregation of the city's public schools; the white voters of these suburban parishes were not receptive to black candidates.[22]

In *Citizens for a Better Gretna v. City of Gretna*,[23] the district court found legally significant racial bloc voting in certain city alderman elections in Jefferson Parish.

In the twentieth century, no black person has served on the Louisiana Supreme Court. In the twentieth century, at least two black persons have sought election to·

---

**11.** 574 F.Supp. 325 (E.D.La.1983) (three-judge court).

**12.** *See* La. Const. of 1898, art. 197, § 3.

**13.** *See id.* art. 197, § 5.

**14.** *See Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944).

**15.** For a description of how single-shot (bullet) voting works, see *City of Rome v. United States,* 446 U.S. 156, 184 n. 19, 100 S.Ct. 1548, 1565 n. 19, 64 L.Ed.2d 119 (1980). While the context of corporate rights is different, its concerns with minority voting votes provides instructive analogy. *Cf., e.g.,* La.Rev.Stat.Ann. § 12:75(I) (West 1969) (generally providing for plurality-vote at-large elections for corporate directors).

**16.** *See Major,* 574 F.Supp. at 340.

**17.** *Id.* at 337–38.

**18.** *Id.*

**19.** *Id.* at 340–41.

**20.** Presently pending before this Court sitting as a three-judge court is a summary judgment motion by the federal government that Louisiana is still operating a dual system of higher education. *See United States v. State of Louisiana,* Civ. 80–3300.

**21.** *Major,* 574 F.Supp. at 341.

**22.** *See id.* at 339.

**23.** 636 F.Supp. 1113 (E.D.La.1986), *aff'd,* 834 F.2d 496 (5th Cir.1987).

the Louisiana Supreme Court from the First Supreme Court District.[24] In 1972, Judge Ortique ran for the seat now held by Justice Calogero, with the following results:

| Candidate | Total | Orleans Parish |
|-----------|-------|----------------|
| Ortique | 27,326 | 21,224 |
| Calogero | 66,411 | 33,700 |
| Redmann | 21,865 | 10,240 |
| Sarpy | 74,320 | 34,011 |

Judge Ortique thus received 21.4% of the votes in Orleans Parish. Also, in 1972, a black man named Amedee ran for the seat now held by Justice Marcus, with the following results:

| Candidate | Total | Orleans Parish |
|-----------|-------|----------------|
| Amedee | 11,722 | 8,847 |
| Marcus | 78,520 | 47,725 |
| Bossetta | 35,267 | 19,115 |
| Garrison | 51,286 | 25,437 |
| Samuel | 25,659 | 6,042 |

Mr. Amedee thus received 8.3% of the votes in Orleans Parish. At that time, blacks represented 33.4% of the registered voters in Orleans Parish.

Running an effective campaign for a seat on the Supreme Court from the First Supreme Court District requires significant lead time to obtain endorsements, raise funds, and set up an effective campaign organization to publicize one's candidacy and "get out the vote."

In connection with their motion, plaintiffs have submitted five affidavits: one by statistician Dr. Richard L. Engstrom, one by Civil District Court Judge Revius O. Ortique Jr., one by former Fourth Circuit Judge Israel M. Augustine Jr., one by Civil Sheriff Paul R. Valteau Jr., and one by sociologist Silas Lee III.

Dr. Engstrom has performed two statistical analyses on 27 separate judicial elections wholly within Orleans Parish during the period from September 1978 to October 1987 wherein one or more black candidates ran against one or more white candidates. He used the methods of extreme case (or homogeneous precinct) analysis and bivariate ecological regression, which methods were approved by only a plurality of the U.S. Supreme Court in *Thornburg v. Gingles.*[25] He concluded "that voting within Orleans Parish in judicial elections reflects racial polarization, as that term is defined in *Gingles.*"

Judge Ortique, a black Orleans Parish resident, was elected in 1979 as a judge on the Civil District Court for Orleans Parish, the State's trial court of general jurisdiction in Orleans Parish. In 1984, he was re-elected to a six-year term without opposition. He states the following among other things:

> In my contested race, the vast bulk of my financial support, as well as the majority of the votes I received, came from the black community.

> I have seriously considered running for the Louisiana Supreme Court from the First Supreme Court District. I believe, however, that the current configuration of the district effectively prevents any black candidate from being successful. White voters outnumber black voters by a substantial margin due to the inclusion of the suburbs and Orleans Parish in one multi-member district. Moreover, suburban white voters simply will not support a black candidate. Thus, under the

---

**24.** In their brief, plaintiffs stated that no black person had ever sought such election. *See* Statement No. 61 of Plaintiffs' Statements of Uncontested Material Fact. At oral argument, however, they conceded that their statement was in error.

**25.** 478 U.S. 30, 60, 106 S.Ct. 2752, 2772, 92 L.Ed.2d 25 (1986) (Brennan, J., for plurality on this point); *see also id.* at 82–83, 106 S.Ct. at 2783–84 (White, J., concurring in judgment and disagreeing with Brennan, J., on this point); *id.* at 99, 106 S.Ct. at 2792 (O'Connor, J., concurring in judgment) ("Only a plurality of the Court ... addresses the validity of the statistical evidence on which the District Court relied in finding

racially polarized voting in each of the challenged districts.").

Whether Dr. Engstrom's analysis in this case comports with what even the plurality was approving in *Thornburg* is unclear. While Dr. Engstrom centered his analysis in this case on the race of the *candidates,* the plurality stated that "the race of the candidate *per se* is irrelevant to racial bloc voting analysis." *Id.* at 67, 106 S.Ct. at 2775. *But cf. id.* at 68, 106 S.Ct. at 2775–76 ("Because both minority and majority voters often select members of their own race as their preferred representatives, it will frequently be the case that a black candidate is the choice of blacks, while a white candidate is the choice of whites.").

present scheme, I will not run. Nor do I know of any other black candidate with a broad base of support in the black community who would undertake the clearly futile attempt to achieve election from the First Supreme Court District.

I am deterred from running by the current configuration of the First Supreme Court District. If, however, a Supreme Court district were to be created that contained only Orleans Parish, I would run. Such a district would offer the black community an excellent opportunity to elect the candidate of its choice, because blacks constitute a majority of the registered voters in Orleans Parish.

. . .

He continues by stressing his experience that "fundraising by judicial candidates is heavily dependent on the perceptions of potential contributors regarding the likelihood of success" and that "incumbency is a tremendous advantage." He thus is of the opinion that "allowing the election to go forward as scheduled and then scheduling a special election would disadvantage a black candidate who chose to contest a fairly districted seat at such a special election." He added that an effective campaign for judicial office requires about 9 to 18 months "lead time" and that "if the upcoming election were to go forward, it would be impossible for a black candidate to mount an effective campaign."

Former Judge Augustine, another black Orleans Parish resident, was a judge of the Criminal District Court for Orleans Parish from 1969 to 1981, at which time he was elected to the Fourth Circuit Court of Appeal, on which he served until his voluntary retirement in 1984. In his two contested races, he "received most of [his] financial and political support from the black community." He believes he "was able to win solely because the district in which [he] ran was predominantly black." He then reiterates the same basic conclusions as does Judge Ortique.

Civil Sheriff Valteau was elected to his position in 1982. He is "convinced that the only place that a Black candidate has a 'fair opportunity' to be elected to public office is in Orleans Parish." He adds that "it is virtually impossible to elect a Black person who is required to seek office from a multiparish district."

Mr. Lee is a sociologist instructor and president of a public opinion, research, and consulting firm in New Orleans. He is of the opinion that "the chance that a black candidate could win a seat on the Louisiana Supreme Court from the First Judicial District in its present form is nonexistent" but that if a black candidate could win an election "from a district containing only Orleans Parish." He believes the upcoming election should be enjoined "because, even if the district were to be redrawn later this spring to include only Orleans Parish, it would be difficult, if not impossible, for a black candidate to mobilize financial and political support in the short time remaining before the October 1, 1988, election."

Defendants presented almost no evidence in opposition to plaintiffs motion. They presented just two affidavits, one by Associate Justice Calogero and one by Gregory Pechukas.

Justice Calogero was first elected in 1972 to fill a two-year unexpired term for the First Supreme Court District. In 1974, he was reelected, and that term is due to expire on December 31, 1988.[26] He intends to seek reelection this fall and has begun preparing for the upcoming election. Included among his preparatory efforts are "his organizing committees, formation of a Calogero Campaign Committee, and conducting fundraising activities." He is aware that at least one other person, "a woman attorney" in his affidavit but known to this Court to be Darleen M. Jacobs, intends to run for the 1988 seat and has begun similar preparatory efforts. He adds that he has been living in Jefferson Parish since 1984, while Justice Marcus has been living in Orleans Parish.

Mr. Pechukas is the Louisiana Supreme Court's Director of the Central Staff, which assists in the review of all criminal cases

---

26. *Calogero v. State ex rel. Treen,* 445 So.2d 736 (La.1984) (holding in a declaratory judgment action that Justice Calogero's present term would be for 14 years, and not 10 years).

on direct appeal and virtually all other criminal cases. Under Louisiana law, the Supreme Court shall review every sentence of death.[27] Since 1976, the Louisiana Supreme Court has considered 82 death penalty appeals, involving 74 defendants. In 49 of these appeals, the Supreme Court affirmed the defendant's conviction and sentence; in 30 of these appeals, the Supreme Court reversed the defendant's conviction and sentence, or affirmed the conviction but reversed the sentence; in the remaining 3 appeals, the Supreme Court remanded the case to the district court for further evidence. Of the 49 affirmances, one case was decided by a 4–3 vote; in two others of the affirmances, rehearings were denied by a 4–3 vote. Of the 30 reversals of conviction and sentence or of sentence alone, 6 were decided by a 4–3 vote.

Plaintiffs filed this action on September 19, 1986. Named as plaintiffs are Ronald Chisom, Marie Bookman, Walter Willard, Marc Morial, and Henry A. Dillon III, all black registered voters in Orleans Parish, as well as the Louisiana Voter Registration/Education Crusade, a nonprofit organization comprised of black Orleans Parish registered voters active in voting rights issues. The plaintiffs are suing, in a class action under F.R.Civ.P. 23(b)(2), on behalf of themselves and all other black registered voters in Orleans Parish. Named as original defendants are Edwin Edwards in his capacity as Governor of the State of Louisiana, James H. Brown in his capacity as Secretary of the State of Louisiana, and Jerry M. Fowler in his capacity as Commissioner of Elections of the State of Louisiana.[28] Plaintiffs allege that the present system for electing the two seats in the First Supreme Court District for the Louisiana Supreme Court violates section 2 et seq. of the Voting Rights Act as amended.[29]

On defendants' motion to dismiss, this Court held that plaintiffs failed to state a cause of action under section 2 because judges are not "representatives" of the body politic.[30] On February 29, 1988, the Fifth Circuit reversed, holding that section 2 applies to judicial elections.[31] On May 27, 1988, the Fifth Circuit denied defendants' motion for rehearing and suggestion for rehearing en banc and ordered that mandate issue immediately. At oral argument, defendants stated they anticipate filing, after the issuance of this opinion but within the time limits permitted by the Supreme Court rules, a petition for a writ of certiorari.

Following the Fifth Circuit panel's decision on February 29 but prior to its denial for rehearing on May 27, plaintiffs moved in the Fifth Circuit for a preliminary injunction to enjoin the upcoming election for Justice Calogero's seat pending disposition of their claim in the U.S. Supreme Court. On May 27, 1987, the panel denied the motion for failure to comply with F.R. App.P. 8(a), "which provides that an injunction request must ordinarily be made in the district court on first instance." The panel added the following dictum:

> In the event the plaintiffs assert their injunction request to the district court, whichever way the district court rules, this Court notes that any election held under an election scheme which this Court later finds to be unconstitutional or in violation of the Voting Rights Act is subject to being set aside and the office declared to be vacant. *See Hamer v. Campbell*, 358 F.2d 215 (5th Cir.1966).

---

**27.** La.C.Cr.P. art. 905.9; *see* La. Const. of 1974, art. 5, § 5(D)(2) ("a case shall be appealable to the supreme court if ... the defendant has been convicted of a felony").

**28.** Buddy Roemer has succeeded Edwin Edwards as governor and W. Fox McKeithen has succeeded Jim Brown as secretary. Pursuant to F.R.Civ.P. 25(d)(1), then, these new officials have been automatically substituted as defendants.

**29.** 42 U.S.C. § 1973 et seq. Their complaint also alleges that this system violates the fourteenth and fifteenth amendments.

**30.** 659 F.Supp. 183 (E.D.La.1987). The Court also dismissed the constitutional claims for failure of plaintiffs to amend their complaint to allege discriminatory intent. *Id.* at 187–89.

**31.** 839 F.2d 1056 (5th Cir.1988). The Fifth Circuit also reversed the dismissal of the constitutional claims. *Id.* at 1064–65.

Plaintiffs now move this Court for the same preliminary injunction.[32]

At the hearing, upon the Court's initiative, all counsel consented to the Court's considering the evidence for the motion as including the entire documentary record before the Court. Further, upon the Court's initiative, all counsel consented to the Court's certifying the plaintiff class on the basis of the present record and for the purpose of the preliminary injunction motion only.

## II.

In order for plaintiffs to obtain a preliminary injunction, they must prove each of four prerequisites:

(1) a substantial likelihood that plaintiffs will prevail on the merits;

(2) a substantial threat plaintiffs will suffer irreparable injury if the injunction is not granted;

(3) that the threatened injury to plaintiffs outweighs the threatened harm the injunction may do to defendants; and

(4) that granting the injunction will not disserve the public interest.[33]

As explained below, the Court finds plaintiffs to have sufficiently satisfied all four elements and concludes, in its discretion, that the injunction should issue.

### A. *Merits*

The Court first disposes of defendants' argument concerning their intended petition for a writ of certiorari and its effect on the first element of the preliminary injunction test. Confident of this Judge's opinion that section 2 does not and should not apply to judges, defendants suggest that plaintiffs cannot show "a substantial likelihood" that their claim will survive U.S. Supreme Court review of the Fifth Circuit's opinion to the contrary.

To quote Judge Rubin in a recent case on facts more pressing for the party aggriev-ed by a Fifth Circuit precedent (the appellant was challenging his death penalty conviction):

In the absence of a declaration by the Supreme Court that executions should be stayed in cases presenting the issue raised by [the appellant before the Fifth Circuit], we must follow our circuit's precedents and deny both a certificate of probable cause and a stay of execution on this issue. The grant of certiorari in *Hitchcock* [476 U.S. 1168, 106 S.Ct. 2888, 90 L.Ed.2d 976] and *McCleskey* [478 U.S. 1019, 106 S.Ct. 3331, 92 L.Ed.2d 737] is insufficient *per se* to raise in this case the requisite to a certificate of probable cause: that the petitioner presents an issue that jurists of reason would consider debatable on the evidence proffered to us, but the fact that the Court has agreed to consider these cases does not alter the authority of our prior decisions.[34]

While this Court adheres to its original opinion, the Fifth Circuit has spoken; this Court is bound by the Fifth Circuit's holding, unless and until that holding is either expressly or tacitly overruled judicially by either the Fifth Circuit or the Supreme Court or legislatively by Congress. Stated another way, the "substantial likelihood" element concerns issues of *fact* in each case as they relate to the law, and not solely issues of *law*. The appropriate question is whether there is a substantial likelihood that plaintiffs will have sufficient evidence to satisfy their burdens of proof under the law as established at this time, not whether there is substantial likelihood that a point of law applicable to the case will be modified by a reviewing authority.

Although this Court recognizes the nation-wide impact of the issues involved in this case inasmuch as over two-thirds of the states choose their judges through elections and believes that U.S. Supreme Court review is warranted to settle the important question of federal law in extending section

---

**32.** Plaintiffs seek a preliminary injunction on just the section 2 claim.

**33.** *Canal Authority v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974).

**34.** *Wicker v. McCotter,* 798 F.2d 155, 157–58 (5th Cir.1986).

2 to apply to persons who do not represent voters, this Court is not at liberty to assess plaintiffs' likelihood, or unlikelihood, of success at the Supreme Court.[35]

■ In *Thornburg v. Gingles*,[36] a case concerning a challenge to an at-large election system for certain legislative positions, the Supreme Court, for the first time, considered the 1982 amendments to section 2 of the Voting Rights Act. Now that it is the law of this case that section 2 applies to judges, this Court must apply the rules of *Thornburg* and its progeny.[37]

In *Thornburg*, a majority of the Court set forth an illustrative list of typical factors to be considered in evaluating a section 2 claim:

the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State of political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions

against bullet [single-shot] voting; the exclusion of members of the minority group from candidate slating process; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.[38]

For section 2 challenges to multimember districts, as here, the Court suggests that the most important of these factors are "the extent to which members of the minority group have been elected to public office in the jurisdiction" and "the extent to which voting in the elections of the State of political subdivision is racially polarized."[39] The other factors are "supportive of, but *not essential to*, a minority voter's claim."[40] "Although many or all of the factors are relevant in a challenge to an at-large system, the Court concluded that 'the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice,'

**35.** Even if the appropriate understanding of the substantial-likelihood element were to require district courts to predict a party's "odds" upon appellate review—a seemingly quite unjusticiable function—this Court would have to reach the same conclusion in this particular case; in light of the unanimous panel opinions of the Fifth Circuit, *Chisom,* 839 F.2d 1056, *reh'g en banc denied,* and the Sixth Circuit, *Mallory v. Eyrich,* 839 F.2d 275 (6th Cir.1988), and the lack of any other, conflicting circuit opinions, this Court would have to ignore the realities of the judicial process in order to conclude otherwise.

**36.** 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).

**37.** For Fifth Circuit progeny, see *Campos v. City of Baytown, Texas,* 840 F.2d 1240, 1242–45 (5th Cir.1988) (affirming on liability, but vacating remedy in a challenge to an at-large system for electing city council members); *Citizens for a Better Gretna v. City of Gretna, Louisiana,* 834 F.2d 496, 498–99 (5th Cir.1987); *Monroe v. City of Woodville, Mississippi,* 819 F.2d 507, 511 (5th Cir.1987) (per curiam) (reversing summary judgment dismissal of challenge to at-large city aldermanic election), *cert. denied,* — U.S. —, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988); *League of United Latin American Citizens v. Midland Inde-*

*pendent School District,* 812 F.2d 1494, 1496–97 (5th Cir.1987) (affirming order that at-large system of electing board of trustees for school district be divided into seven single-member districts), *reh'g en banc aff'g district court on other grounds,* 829 F.2d 546 (5th Cir.1987) (per curiam). *See also Wright v. City of Houston, Mississippi,* 806 F.2d 634, 635 (5th Cir.1986) (per curiam) (remanding in light of *Thornburg* ); *Overton v. City of Austin, Texas,* 798 F.2d 150 (5th Cir.1986) (per curiam) (same).

**38.** 478 U.S. at 44–45, 106 S.Ct. at 2763–64 (citing with approval Sen.Rep. No. 417, 97th Cong., 2d Sess. 28–29 (1982), *reprinted in* 1982 U.S. Code Cong. & Admin. News 177, 206–07); *see also Citizens for a Better Gretna,* 834 F.2d at 498–99 ("the Court [in *Thornburg* ] relied substantially on *Zimmer* as a foundation for the analytical framework prescribed for § 2 claims") (discussing *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam).

**39.** 478 U.S. at 48 n. 15, 106 S.Ct. at 2766 n. 15.

**40.** *Id.* (emphasis in original).

unless 'a bloc voting majority must *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group.'" [41] The Court recast these factors into a broad three-part test:

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority of single-member district. ... Second, the minority group must be able to show that it is politically cohesive. ... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.[42]

The second and third parts, cohesion and majority bloc voting, are usually proven by statistical evidence of racially polarized voting.[43] In short, the ultimate finding of minority voter dilution is to be based on "the totality of the circumstances." [44]

Turning to the facts in this case, the Court summarizes the pertinent aspects of the First Supreme Court District elective system. The First Supreme Court District is the only multimember Supreme Court District and has the largest Supreme Court District in population. Elections for the Louisiana Supreme Court are covered by Louisiana's majority-vote requirement. Because election terms for the two seats from the First Supreme Court District are staggered, it is impossible for voters within the district to "bullet," or "single-shot," vote.

■ Defendants' sole evidence (the affidavits of Justice Calogero and Mr. Pechukas) do not concern the merits, but rather the equitable issue of whether the proposed injunction would be in the public interest.

Where, as here, a defendant offers no rebutting evidence, the plaintiff need only prove a *prima facie* case on the merits in order to satisfy the "merits" element to the preliminary injunction test; in such cases, the plaintiff establishes a substantial likelihood of success by establishing a *prima facie* case. On the one hand, to permit a plaintiff to establish less would improperly require the Court to presume the existence of evidence the plaintiff may not have or may wish not to present at any final hearing on the merits; on the other hand, to require more would improperly require the Court to presume the existence of evidence the defendant may not have or may wish not to present at any final hearing on the merits. In this case, then, the Court must determine whether plaintiffs have established a *prima facie* case that the present elective system violates section 2.

As for the first of the two critical factors identified in *Thornburg*, it is undisputed that no black person in this century has ever served on the Louisiana Supreme Court.

As for the second of these two factors— the presence of racially polarized voting— the limited evidence presented establishes, at least for this interim *prima facie* showing, that elections in the four parishes that constitute the current First Supreme Court District, and in particular judicial elections, may be characterized by racial bloc voting.

Implicit in Judges Ortique and Augustine's affidavits is their testimony that black voters in this area continue to prefer black candidates and white voters in this area continue to prefer white candidates and that white voters will not vote for black candidates, whom black voters prefer.[45] Taking judicial notice of certain

---

**41.** *Campos,* 840 F.2d at 1239–40 (quoting *Thornburg,* 478 U.S. at 49, 106 S.Ct. at 2766) (emphasis in *Thornburg* ).

**42.** 478 U.S. at 49–53, 106 S.Ct. at 2766–67.

**43.** *Campos,* 840 F.2d at 1243.

**44.** *Id.* citing *Thornburg,* 478 U.S. at 79–80, 106 S.Ct. at 2782 (Brennan & White, JJ.) ("The District Court in this case carefully considered the totality of the circumstances"); *see also Thornburg,* 478 U.S. at 106, 106 S.Ct. at 2796 (Stevens,

J., dissenting in this part, with Marshall & Blackmun, JJ., joining) (stating that J. Brennan's plurality "accurately summarizes" the district court's findings).

**45.** The affidavits of Judges Ortique and Augustine and of Civil Sheriff Valteau focus primarily on the effect of the present elective system on black candidates, rather than on black voters. While a majority of the Court in *Thornburg* rejected the plurality's suggestion that a candidate's race is irrelevant and is not to be con-

facts found by the court in *Major v. Treen,* this Court remarks that other black New Orleans politicians have made the same observation.[46]

Because the statistical method that Dr. Engstrom appears to have used has only been approved by a plurality of the Supreme Court,[47] because this Court observes that Dr. Engstrom's correlation coefficients differ from the corresponding coefficients by the plaintiffs' expert in *Major v. Treen,*[48] and because this Court's experience has shown that lone statistics not yet subjected to cross-examination (for example, through rebutting statistics) quite often inaccurately describe actuality, the Court gives little effect to his statistical findings, beyond his general corroborating conclusion that blacks in this district generally vote for blacks and whites in this district generally vote against blacks.

As for other of the *Thornburg* factors, the Court takes judicial notice of Louisiana's past *de jure* policy of voting-related racial discrimination. Throughout the earlier part of this century, the State implemented a variety of stratagems including educational and property requirements for voting, a "grandfather" clause, an "understanding" clause, poll taxes, all-white primaries, anti-single-shot voting provisions, and a majority-vote requirement to

"suppres[s] black political involvement."[49] The Court adds, however, that there has been no evidence presented of blacks now being excluded from candidate slating processes or of the use of overt or subtle racial appeals in political campaigns.

All three practices identified in *Thornburg*[50] as tending to exacerbate the diluting effect that at-large elections have on minority groups are present in this case. First, the First Supreme Court District is an "unusually large election distric[t]." Specifically, it has a far larger population than any other Supreme Court District[51] and further is the *only* multimember district in the state. Second, Louisiana has a majority-vote requirement. Finally, the existence of staggered terms for the two seats in the First Supreme Court District precludes "single-shot" voting.[52]

Following *Thornburg,* this Court also applies its three-part test for assessing whether the choice of multimember, rather than single-member, districts will "impede the ability of minority voters to *elect* representatives of their choice."[53] As for the second and third parts, the Court reiterates its discussion on the evidence of racially polarized, or bloc, voting.[54] As for the first part, the Court observes that Orleans Parish residents constitute a majority of the

---

sidered as a statistical factor for determining whether racial bloc voting exists, *compare* 478 U.S. at 65–69, 106 S.Ct. at 2775–77 (Brennan, J., joined on this point by Marshall, Blackmun & Stevens, JJ.) *with id.* at 81–84, 106 S.Ct. at 2783–84 (White, J., concurring in judgment) *and id.* at 101, 106 S.Ct. at 2793 (O'Connor, J., joined by Burger, C.J., & Rehnquist & Powell, JJ., concurring in judgment), this Court must emphasize that the voters, and not the candidates *per se,* are the central concern of section 2. There is enough in the affidavits, however, for the Court to supply sufficient relevant inferences about not only candidates, but also voters.

**46.** *Major,* 574 F.Supp. at 338 (citing former Mayor Ernest Morial).

**47.** *See supra* at page 1528 & n. 25.

**48.** *See id.* at 337–38 n. 17.

**49.** *Id.* at 340.

**50.** 478 U.S. at 45, 106 S.Ct. at 2764 (citing Sen. Rep., *supra* note 38, at 29).

**51.** The Court questions the extent to which this factor is relevant for analysis of *judicial* elections. *See Wells v. Edwards,* 347 F.Supp. 453 (M.D.La.1972) (three-judge court) (holding that the "one man/one vote" principle of apportionment does not apply to states' judiciaries), *aff'd mem.,* 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973).

**52.** *See City of Rome,* 446 U.S. at 185 n. 21, 100 S.Ct. at 1566 n. 21.

**53.** 478 U.S. at 48, 106 S.Ct. at 2766 (emphasis added). The Court must reject plaintiffs' broad position that this Court may focus wholly on the right to *vote,* without consideration of the necessary consequences therefrom (viz., the ability to elect a person of one's choice). References to the abstract right to vote would be meaningless unless they necessarily considered the ultimate effect—having the person of one's choice elected or not.

**54.** *See supra* text accompanying notes 42–43.

residents in the First Supreme Court District, that black residents in Orleans Parish represent a majority of its residents, and that black voters in Orleans Parish represent a majority of its voters. In other words, the class of black voters in First Supreme Court District is "sufficiently large and geographically compact to constitute a majority in a single-member district." [55]

■ In sum, upon considering the totality of the circumstances, this Court holds that plaintiffs have established a *prima facie* case that the present elective system for the two seats on the First Supreme Court District violates section 2 of the Voting Rights Act and thus, in this case, have established a substantial likelihood of success on the merits.

### B. *Irreparable Injury*

■ An injury is irreparable if it "cannot be undone through monetary remedies." [56] The right at issue in this case, the right to vote, is entirely nonpecuniary, and no amount of financial compensation can redress its deprivation.

It appears from the affidavits of Judges Ortique and Augustine that no potential candidate with a broad base of support from the Orleans Parish black voting community is presently intending to run for the upcoming election this October because of a perception of doomed defeat. [57] Suggesting that they have not yet begun "to get the vote out," the two imply that they would not run in 1988 regardless of how this Court may rule.

Thus, for the period preceding this Court's final resolution [58] of the status of Justice Calogero's present seat (however long that period may be), if no candidates with large black support is intending to run, then black voters as well as all other voters will suffer no worse if no injunction issues than if one does issue—as far as their being able to elect the candidates of their choice. On the one hand, if an injunction issues, then the seat may continue to be occupied by a justice who won his seat in 1974 under a voting system that at this preliminary point has been determined to have been *prima facie* illegal. On the other hand, if no injunction issues, then the seat shall be occupied by a justice who will win the 1988 seat under the same voting system. The sole difference is the year in which the person who occupies the seat has been or will be elected, for there has been no material change between 1974 (or even earlier) and now in how the seat is to be chosen.

---

**55.** By this observation, the Court expresses no opinion whether plaintiffs' requested division—one district consisting of Orleans Parish and the other consisting of the three surrounding parishes—should be the appropriate remedy. The Court observes, however, that improper dilution of minority group voting strength may arise from the concentration of the minority voters into a district where they represent an excessive majority. *See Thornburg,* 478 U.S. at 46 n. 11, 106 S.Ct. at 2764 n. 21.

**56.** *Spiegel v. City of Houston,* 636 F.2d 997, 1001 (5th Cir. Unit A 1981).

**57.** Because the plaintiff class may include other persons who, unlike Judges Ortique and Augustine, nevertheless intend to run this fall as candidates of the black voters' choice, the Court must note the additional irreparable injury that may affect plaintiffs if the upcoming election proceeds. If such a black candidate would run this year, then the resources from the black community to contest any later special election would be diminished by an expenditure of effort in a perhaps essentially meaningless election in 1988. To the extent the *prima facie* showing herein is indicative of an actual violation of section 2, black voters in 1988 would not have the equal opportunity to try to elect the candidate of their choice. That a special election in the future may be constitutionally proper in no way makes the effects of an improper election any more palatable.

**58.** The time of final resolution should not be understood to be any date of judgment within the meaning of F.R.Civ.P. 54. Rather, in this context, it should be understood as the time when an election is finally held, or an appointment finally made, in response to the Court's final judgment. If liability is ultimately found, then the election (or appointment) will be in some yet-to-be-determined form; otherwise, the election will continue under the present system.

While the Court generally speaks of an appropriate remedy as being an elective system, the Court expresses no opinion whether the remedy must be an elective system (for example, the State may enact another method for selecting judges) or what elements any elective system must, or may not, have.

But focus solely on pre-remedy period is too myopic a focus. The Court cannot ignore the tremendous power and benefits of incumbency, alluded to by Judge Ortique and well-recognized by all who are knowledgeable students of the electoral process. If the upcoming election were not enjoined, then the (white) person elected this fall would enjoy the enviable position of being a recent incumbent. Because this incumbency advantage would have been obtained through a system that, at least under the instant, interim *prima facie* showing, has improperly diluted black voting strength, black voters, among others, would be unfairly harmed by having the candidates of their choice run under this handicap.

While Justice Calogero in any event would have an advantage as an incumbent elected 14 years ago, this advantage would be vastly enhanced he were to run and win again this fall, for his name would become vastly fresher in the voters' minds by the time the new remedy is implemented, whenever that may be, than otherwise. By granting the injunction, the Court mitigates the effects of any unfair advantage from incumbency.

Even if plaintiffs prevail on the merits of liability and the district is divided into two single-member districts as they requested,[59] this Court can provide no guarantee that the seat up for election in 1990 will in fact be "assigned" to Orleans Parish. Voters in *both* new districts will have a claim that their district should not served by a justice elected in large measure by voters outside the district. Because of the equitable difficulty in deciding which of the two districts should include the 1990 seat and which the 1998 seat, this Court may

well decide to assign the present two positions to the new districts in a wholly random fashion. In such case, if no injunction issues, the Orleans-based seat might well be the 1998 seat, thus delaying the parish's black voters the benefit of the new election process.

### C. *Balance of Harm to Defendants*

The sole defendants in this matter are the governor, the secretary of state, and the election commissioner. These three appear to have two interests relevant to this motion: the secretary and the elections commissioner are responsible for conducting elections, while the governor is responsible for seeing that the law is executed faithfully.

The only potential injury defendants may suffer if an injunction is granted is the expense of conducting a special election, should plaintiffs ultimately *fail* on the merits.[60] But this potential injury alone is insufficient to defeat the injunction. First, as the Court has concluded as a matter of law, plaintiffs have satisfied the requirement of substantial likelihood on the merits. Second, defendants have offered no evidence whatever that these costs outweigh the threatened irreparable injury to plaintiffs; expenditure of public funds are to be given a minimal weight in determining whether or not to insure the application of constitutional mandates. Third, it is entirely possible that any future election to fill seats on the Supreme Court can be coordinated with regularly scheduled elections, thereby avoiding entirely any such expense.[61]

The governor's duty to see that the laws are faithfully executed extends to all citi-

---

**59.** The appropriate remedy may well be, for example, a mere elimination of the staggered-seat provision, or some other remedy that nonetheless maintains the multimember provision. Whatever the remedy, however, the Court notes that section 2 prohibits the fashioning of a district formed for the purpose of assuring to an almost absolute certainty or otherwise that a minority candidate *will* be elected. *See* 42 U.S. C. § 1973(b) ("... nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population"). The remedy is only to cure the vote dilution.

**60.** While a special election is likely in the event plaintiffs ultimately prevail on the merits, such would likely be necessary whether or not this Court now enjoins the 1988 election.

**61.** *See, e.g., Smith v. Paris,* 386 F.2d 979 (5th Cir.1967) (per curiam) (shortening terms of officials elected under discriminatory at-large scheme so that new elections would coincide with next regularly scheduled elections).

zens of the State. If the present election scheme violates section 2 (and thus, under the Supremacy Clause, the "laws" that are to be faithfully executed), it injures the entire State, whose laws are expounded by a Supreme Court chosen in a fashion that at this preliminary stage appears to be *prima facie* exclusionary.

### D. *Public Interest*

If plaintiffs ultimately succeed on liability, as they have shown they are substantially likely to do, then one of two scenarios would occur if no injunction were granted: (1) the candidate elected in 1988 would serve a full 10-year term or (2) the 1988 election would have to set aside in order that any new system with regard to that seat may be instituted prior to the expiration of that 10-year term. Either scenario would disserve the public interest.

Under the first scenario, the person elected in 1988 would be elected from the entire four-parish district. The electorate in the new, remedied district to which the 1988 incumbent's seat would be allotted would be deprived of its right, under a constitutionally adequate system, to elect a justice from that district until at least 1998. Further, Justice Marcus (whose seat is up for reelection in 1990) [62] would be deprived the opportunity, usually afforded to a public official whose district has been divided, to run for election in either of the two newly created districts. The first scenario, then, would be patently unfair.

Of course, the likelihood that the first scenario would be the one that would represent reality is slim. As the Fifth Circuit hinted in its May 27th dictum, this Court would likely have to set such an election aside well before 1998, when the 10-year term would normally expire.[63] But this second scenario is no more palatable. Not only would campaign expenses would incurred and unrecoverable and effective campaign strategies revealed, but also, perhaps more importantly, voters' confidence in the electoral process would be diminished from a perceived instability in our form of government. The nature of federal power to void state elections is "[d]rastic, if not staggering," and the exercise of such power is "a form of relief to be guardedly exercised." [64]

Further, the possibility that such power would be exercised may likely dampen interest both in seeking office and in voting and may likely diminish financial support for candidates. Otherwise potential candidates may be unwilling to expend time and money or to reveal campaign strategies that may or may not result in a term of office of possibly just one or two years. Thus, even if the Supreme Court reverses the Fifth Circuit on the 12(b)(6) issue or if this Court ultimately concludes that defendants should prevail on the merits, any election before either such possible event would be adversely affected if no injunction were granted.

As already explained in Part II(B) above, it would be unfair to all persons opposing a candidate at any remedial election that may be held in the future for the candidate to run this fall and win under the present scheme and thereby have an unfair advantage as a recent incumbent at the subsequent election.

Additionally, the qualities of deliberation and nonpoliticization that Louisiana's decade-long term of office now helps serve—and that should be among the hallmarks of proper judicial functioning—would be undermined by creating, what may be in essence, a one-to-two year term. In this connection, the Court notes that many of con-

---

**62.** If the remedy chosen completely redraws the present districts throughout the state, *cf.* La. House Bill No. 1630 (1988), then other justices may be adversely affected just as Judge Marcus would be.

**63.** *See, e.g., Watson v. Commissioners Court of Harrison County,* 616 F.2d 105, 107 (5th Cir. 1980) (per curiam) (service for another four years too long); *Smith v. Paris,* 386 F.2d 979, 980 (5th Cir.1967) (per curiam) (ordering spe-

cial election at next regularly scheduled election in two years); *Hamer v. Campbell,* 358 F.2d 215, 222 (5th Cir.) (service for another four years too long), *cert. denied,* 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79 (1966), *cited in Chisom,* Order (5th Cir. May 27, 1988) (No. 87–3463).

**64.** *Bell v. Southwell,* 376 F.2d 659, 662 (5th Cir.1967); *Cook v. Luckett,* 735 F.2d 912, 921 (5th Cir.1984).

cerns in holding over representative official beyond the end of their term are absent with respect to judiciary officials. Specifically, the concerns that an official may no longer fairly represent the partisan interests of his constituency ought not be present with held-over judges, for, as this Court noted in its original opinion, "[j]udges, by their very definition, do not represent voters." [65]

While an injunction most certainly will dash the expectations of present candidates for the 1988 election, or at least of Justice Calogero (who it appears has not yet even announced his candidacy), no candidate can have a legally cognizable interest in being able to seek election from a district whose configuration violates the Voting Rights Act.[66]

Defendants raise the specter of a state constitutional limbo where criminal defendants' rights and/or the public's interest in its criminal justice system may be jeopardized from an inability to form Louisiana Supreme Court majorities of four [67] once Justice Calogero's present seat expires at the end of this year. This Court acknowledges the specter, but observes that a limbo status will exist whether the Court enjoins the upcoming election or not. If this Court enjoins the election, then the question of how to fill the vacancy under Louisiana Constitutional law arises.[68] If this Court does not enjoin the election, then the question of the legitimacy of the Supreme Court's seven-member composition arises. Regardless of the state constitutional provisions, this Court has in any event the power under the Supremacy Clause to fashion both preliminary and final equitable relief that will both provide plaintiffs with a full and adequate remedy and protect other important state interests.[69] In sum, this specter does not strongly militate against an injunction.

### E. *Exercise of Discretion*

Courts ought be wary of enjoining elections when the plaintiffs dash into court on the eve of an election, after the State has begun its electoral process and candidates have expended considerable time and money campaigning.[70] But this is not such a case. Plaintiffs here brought their suit a full two years before the upcoming election and have brought the instant motion so that there is even time to appeal this opinion before the three-day qualification period at the end of this month. Further, plaintiffs filed their lawsuit within three months of *Thornburg*, the first post–1982 amendment Supreme Court case on section 2. Pointing out at oral argument that Louisiana has had the same elective system for its justices since prior to the 1965 Voting Rights Act, defendants suggest that plaintiffs should have brought their action much earlier and should have anticipated the likely delays from appellate review. While an earlier determination of these issues would

---

65. *Chisom*, 659 F.Supp. at 186.

66. *Cf. Morial v. Judiciary Commission of the State of Louisiana*, 565 F.2d 295 (5th Cir.1977) (en banc), *cert. denied*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978).

67. *See* La. Const. of 1974, art. 5, § 3 ("The supreme court shall be composed of a chief justice and six associate justices, four of whom must concur to render judgment. ...").

Defendants' fear may be largely for naught inasmuch as Louisiana state law appears not to require that there always be seven justices sitting for every case before the Louisiana Supreme Court. *See Jackson v. United Gas Public Service Co.*, 196 La. 1, 198 So. 633, *cert. denied*, 311 U.S. 686, 61 S.Ct. 63, 85 L.Ed. 443 (1940).

68. While this Court expresses no authoritative position on the point at this time, this Court notes that La. Const. of 1974, art. 5, § 22(B) appears to provide fully for the contingency of any vacant seat on the supreme court.

69. *See, e.g., Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (under the Supremacy Clause, the federal Voting Rights Act trumps any state constitutional provisions to the contrary); *Kirkland v. New York State Dept. of Correctional Services*, 628 F.2d 796, 801 (2d Cir. 1980) (power of a district court to fashion a remedy for discrimination "is a matter of federal law under the supremacy clause," not a matter of "compatibility" with state constitution), *cert. denied sub nom. Fitzpatrick v. Kirkland*, 450 U.S. 980, 101 S.Ct. 1515, 67 L.Ed.2d 815 (1981).

70. *See Oden v. Brittain*, 396 U.S. 1210, 90 S.Ct. 4, 24 L.Ed.2d 32 (1969) (Black, J., in chambers) (denying application to enjoin upcoming election that was less than 3 weeks away).

have benefitted all concerned, the Court does not find plaintiffs' actions to be such that the Court should exercise its discretion to deny an injunction despite the plaintiffs' having satisfied the four prerequisites for such.

Chief Justice John A. Dixon Jr. has appeared in this matter as an *amicus curiae* and urges three reasons why this Court should not grant any injunction: (1) absent a final determination in any forum that the elective system violates federal law, "the Louisiana Constitution should be respected"; (2) "the probability that the issuance of an injunction in this case will lead to the cancellation of numerous state elections scheduled in 1988"; and (3) "the issuance of an injunction in this case would ... also set a precedent which is likely to be followed by" other U.S. District Courts. To accept the first point would be to foreclose the option of preliminary injunctions on federal constitutional issues (viz., Supremacy Clause issues); to accept this point would leave many a plaintiff without an adequate remedy. The second and third point suggest that this Court's nonbinding precedential authority will wreak havoc in the State's elective system. While this Court is aware that its opinion may well affect more than the two seats at issue in this case, this Court cannot conclude that the necessary result should thus be a failure to act. In every case that comes before it, this Court attempts to administer the law in a *"just,* speedy, and inexpensive" fashion;[71] this case is no different. If other courts believe this Court has erred, then they have a duty not to follow this Court's lead; if other courts believe that this Court has been persuasive and that the cases before them concern similar facts and equities, then they may, if they choose, follow this Court's course of action.

In sum, the Court determines, in its discretion, that the injunction should issue.[72]

**71.** *Cf.* F.R.Civ.P. 1.

**72.** In its discretion under F.R.Civ.P. 65(c) and because defendants have not requested any security in the event the Court granted an injunc-

### III.

Accordingly, the Court hereby ORDERS that pending a final decision by this Court in this action and the entry of a future order scheduling elections for the affected Supreme Court justiceships, defendants Buddy Roemer in his official capacity as the Governor of Louisiana, W. Fox McKeithen in his official capacity as Secretary of the State of Louisiana, and Jerry M. Fowler in his official capacity as Commissioner of Elections of the State of Louisiana and their officers, agents, servants, employees, and attorneys are enjoined and prohibited from conducting any primary or general elections in the State of Louisiana to fill the position of Justice on the Louisiana Supreme Court from the First Supreme Court District.

tion, the Court elects to require no security from plaintiffs. *Corrigan Dispatch Co. v. Casa Guzman, S.A.,* 569 F.2d 300, 303 (5th Cir.1978).